A. J. MAURER, Jr., aka Arthur J. Maurer, Jr., and Mary Mauch, Appellants (Plaintiffs below),

v.

Joan BALLOU and Quintin Ballou, Appellees (Defendants below).

No. 3639.

Supreme Court of Wyoming.

May 3, 1968.

William A. Riner, Cheyenne, for appellants.

Cecil K. Hughes, of Reynolds & Hughes, Sundance, for appellees.

Before HARNSBERGER, C. J., and GRAY, McINTYRE and PARKER, JJ.

Mr. Justice PARKER delivered the opinion of the court.

Counsel aptly characterize this case as involving a family dispute concerning a number of unpatented bentonite claims in Crook County. Following the death of A. J. Maurer, Sr., April 10, 1966, his son, A. J. Maurer, Jr., hereinafter referred to as Maurer, and daughter, Mary Mauch, sued their sister, Joan Ballou, and her husband, Quintin, to quiet their title to the claims, alleging that Maurer had for many years been owner of the claims in issue and that on November 18, 1965, in anticipation of leaving the State on an extended trip east he signed a quitclaim deed for the property to his sisters, Mary and Joan, and left it with his brother-in-law, Quintin, it being understood the deed would remain in Ballou's possession and be returned to Maurer after the trip, that instead the deed was recorded, but that there had never been delivery of the deed. Plaintiffs also alleged in other counts lack of consideration, false and fraudulent representations of Ballou, false and fraudulent acts of defendants, and that Maurer had on learning of their acts executed another quitclaim deed to Mary Mauch on the same property, reserving a life estate in the claims. Defendants answered, asserting failure to state a claim, pleading that other persons were owners of interests in the claims and necessary parties, admitting the execution and delivery of the deed and recording thereof, and alleging affirmatively that the deed was executed by Maurer at the direction of his father in an attempt by the father to settle the estate prior to his death, and that the parties to the suit in reliance thereon had accepted distribution, become bound thereby, and incurred obligations so that plaintiffs were estopped from asserting the November 18 deed to be invalid. Following trial to the court, plaintiffs' complaint on the mentioned causes of ac-

tion was denied and Joan Ballou's title to an undivided one-half interest in the bentonite claims was quieted against plaintiffs, who have appealed.

Although the testimony was sharply conflicting regarding the time and the manner in which Joan Ballou came into the possession of the quitclaim deed, plaintiffs recognize that since defendants were successful below for the purposes of this appeal the testimony favorable to the Ballous must be taken as established fact. In essence, such testimony reflected that while Joan and her brother were at their father's home sometime in October 1965 Maurer asked her to type up a deed to Mary and Joan, telling her this was what their father wanted. After typing the deed, she gave it to her brother and father for examination, and it was returned to her a few days later with the request that, because of a mistake, it be retyped. After she complied with their request, the deed was taken home with them, and she did not see it again until March 1966, although subsequently in her home her brother had explained how documentary stamps were to be obtained and placed on the deed before recordation "if and when" the deed was delivered to her. On March 8 or 9, 1966, Joan and her brother were with their father in his hospital room in Belle Fourche, and upon the father's inquiry Maurer said he had not delivered the deed to Joan or her sister but intended to. On March 9 or 10 before entering the hospital to visit their father, Maurer said to Joan, " 'I want you to take this deed. It has to be delivered to you or Mary. If you ever record it, you will have to have revenue stamps on it, but I will explain that to you later.' " To this she replied, " 'Well, since we're eating supper together Mary or I will decide at supper who is to keep it,' " and took the deed. That evening although both sisters indicated they did not wish to be the one to "keep" the deed, Joan said she would "take it" and was told by her brother to put it in a safe place such as her safe deposit box. On March 11 when Joan and her brother were

visiting their father, Maurer told him that he had " 'delivered that deed to Mary and Joan the other night. Joan ended up with it.' "

Maurer testified that on the day that he "picked the deed up" from Joan she did not pay him any money and that Mary Mauch never paid any money concerning the November 18 deed. Joan stated she did not give her brother "cash" in exchange for the deed but explained in some detail that she would have received more out of her father's estate if she and her sister had not received the deed.

On August 5, 1966, Maurer executed a second deed to the mining claims which were the subject of the first deed, conveying the claims to Mary Mauch, reserving a life estate therein to himself, along with the right of all rents, royalties and profits, and receiving in payment $1,500 from his sister, Mary. This deed was recorded on August 5. The following day Maurer and his two sisters met and he asked Joan for the return of the November deed, but she refused and on August 8 recorded it, not knowing of the deed to her sister Mary until the institution of the present suit.

Exhibits introduced by defendants included a quitclaim deed for some twenty-three bentonite claims not involved in the present action, which was executed by Maurer's father in Maurer's favor on March 8, 1966, and recorded May 6, 1966; warranty deed from Maurer's father to him for certain real estate in Crook County, dated and acknowledged April 14, 1956, and filed for record April 15, 1966; and a quitclaim deed to certain bentonite placer mining claims from the father to Maurer, Mary, and Joan, executed April 14, 1956, and filed for record April 15, 1966. Maurer indicated he did not know if he personally recorded these three exhibits but said he contributed "to having them recorded."

In their appeal defendants say the matter of the correctness of the trial court's judgment resolves itself into two questions:

(1) Did the trial court correctly conclude on the basis of defendants' testi-

mony that there was delivery of the deed of November 18, 1965; and

(2) Did it correctly conclude on the basis of defendants' testimony that the deed of November 18, 1965, was supported by consideration and was a valid deed?

Appellants set out at length statements from encyclopedic works and textbooks concerning the element of delivery as one of the requirements of a complete and effective conveyance as basic in the law of deeds, and submit the testimony presented in the instant case to indicate that Joan was in reality accepting custody and not delivery of the instrument.

■ As noted in 3 American Law of Property, p. 332 (1952), the question of acceptance by the grantee has furnished the subject matter for numerous decisions, with frequent judicial criticism of the importance accorded to the matter, the rule in England being that title passes by virtue of the delivery alone, but the American rule appearing to be that acceptance is essential—acceptance in the absence of fraud, artifice, or imposition, being implied. As the court said in Halleck v. Halleck, 216 Or. 23, 337 P.2d 330, 336, by this presumption American cases have achieved substantially the same result as the English cases; however, that court held:

> "The same result can be arrived at directly by eliminating the requirement of acceptance in stating the operative facts necessary to transfer title. If it should occur that the vesting of title in the grantee is not beneficial to him or for some reason he does not wish to retain it, he may disclaim and revest the title in the grantor. * * * This appeals to us as the sounder approach and we hereby adopt it. Therefore, acceptance was not necessary to vest title in the plaintiff."

Approval or rejection of such a view is unnecessary in the case at hand since we consider there to have been substantial evidence of actual acceptance of the November 18, 1965, deed.

On their second question, plaintiffs point to the fact that although the quitclaim deed recited six hundred dollars as having been paid, defendant Joan Ballou admitted this exchange of money had not taken place, and they further say that Joan's testimony discloses the nearness of relationship could not be deemed good consideration. In so doing they analyze in detail the testimony surrounding the typing and alleged delivery of the deed, concluding that it added up to a situation in which the son was under the domination of his father to such an extreme degree that the father was dictating what the son should do with his own property by requiring the giving of the deed in question, and insist that these circumstances, as Joan testified to them, were clearly sufficient to bring into play the law relative to undue influence, as the same relates to the execution and delivery of deeds of conveyance, and to make proper an inquiry by the court into the adequacy of the consideration for the deed of November 18, 1965.

■ We find no merit in this argument of appellants. Initially, it may be reiteration, but important nevertheless, to observe the existence of testimony to the effect that there had been consideration given for the deed, i. e., Joan would have received more from her father's estate (e. g., a share of the real estate and of bentonite claims on leases she had been receiving payments for). Furthermore, this court recognized in Strom v. Felton, 76 Wyo. 370, 302 P.2d 917, 922, the rule that, as between the parties, their heirs or privies, a deed is good without consideration in the absence of some wrongful act on the part of the grantee, such as fraud, or undue influence. In the instant case we approve the court's ruling during the trial when he specifically stated there was no evidence of fraud whatever. Defendants had not been accused of undue influence in the pleadings, and even if such omission be overlooked, only by the most strained construction of the testimony could undue influence even be guessed at.

We find no error in the judgment of the trial court and accordingly it is affirmed.

Affirmed.